## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| Commonwealth of Pennsylvania, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>EQT Corporation, )<br>)<br>QEP Partners, LP )<br>)<br>Quantum Energy Partners Fund VI, LP, and )<br>)<br>Q-TH Appalachia (VI) Investment Partners, LLC, )<br>)<br>Defendants. ) | Case No. 2:23-cv-1483 |

## COMPLAINT

The Commonwealth of Pennsylvania, by and through the Office of Attorney General, ("Plaintiff") alleges that EQT Corporation ("EQT"), and QEP Partners, LP, Quantum Energy Partners Fund VI, LP, and Q-TH Appalachia (VI) Investment Partners, LLC, (collectively, "Quantum") have violated Section 8 of the Clayton Act, 15 U.S.C. § 19 and Section 3 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-3.

## I.     NATURE OF THE COMPLAINT

1.     Plaintiff brings this civil antitrust action to challenge the proposed transaction between two competitors in the market for the production and sale of natural gas in the Appalachian Basin, including the Commonwealth of Pennsylvania.  Plaintiff alleges that EQT and Quantum entered into a Purchase Agreement under which EQT is to acquire two entities controlled by Quantum, THQ Appalachia I Midco, LLC ("Tug Hill") and THQ-XcL Holdings I Midco, LLC ("XcL Midstream"), in exchange for EQT common stock valued at $2.6 billion and $2.6 billion in cash.  The proposed acquisition also included the right to the appointment of the Quantum Energy Partners' CEO Wil VanLoh or another Quantum designee to the EQT board of directors which, if appointed, would create an interlocking directorate in violation of Section 8 of the Clayton Act, 15 U.S.C. § 19 and would result in an unfair method of competition in violation of Section 3 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

2.     Plaintiff seeks permanent injunctive relief to prevent, restrain and/or remedy the adverse effects on competition and consequent harm to the public interest that would result from the proposed acquisition.

## II.     PARTIES, JURISDICTION AND VENUE

3.     Plaintiff is a sovereign state of the United States.  This action is filed on behalf of the Plaintiff, by its Office of Attorney General, pursuant to Section 16

of the Clayton Act, 15 U.S.C. § 26 and Section 4 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-4.  Plaintiff brings this action in its sovereign capacity and as *parens patriae* on behalf of its citizens, general welfare and economy of the Commonwealth of Pennsylvania to prevent and restrain Quantum and EQT from violating Section 8 of the Clayton Act, 15 U.S.C. § 19, and Section 3 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-3.

4. Defendant EQT Corporation is a corporation organized, existing and doing business under and by virtue of the laws of the Commonwealth of Pennsylvania, with its corporate office and principal place of business located at 625 Liberty Avenue, Suite 1700, Pittsburgh, PA 15222.

5. QEP Partners, LP is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its corporate office and principal place of business located at 800 Capitol Street, Suite 3600, Houston, TX 77002, and controls Defendants Quantum Energy Partners VI, LP and Q-TH Appalachia (VI) Investment Partners, LLC.

6. Defendant Quantum Energy Partners Fund VI, LP is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its corporate office and principal place of business

located at 800 Capitol Street, Suite 3600, Houston, TX 77002, and controlled by Defendant QEP Partners, LP.

7. Defendant Q-TH Appalachia (VI) Investment Partners, LLC is a limited liability company organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its corporate office and principal place of business located at 800 Capitol Street, Suite 3600, Houston, TX 77002, and controlled by Defendant QEP Partners, LP.

8. Both EQT and Quantum are, and at all relevant times have been, engaged in "commerce" as defined in Section 1 of the Clayton Act, 15 U.S.C. § 12 and "trade" and "commerce" as defined in Section 2 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2.

9. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 1337 (a).  The Court has supplemental jurisdiction of the claims brought under state law pursuant to 28 U.S.C. § 1367 (a).

10. Defendants have consented to venue and personal jurisdiction in this District.  Therefore, venue in this District is proper under Section 12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391 (b) and (c).

### III.  THE AGREEMENTS

#### The Purchase Agreement

11. Pursuant to a Purchase Agreement dated September 6, 2022, and amended on December 23, 2022, EQT plans to acquire Tug Hill and XcL Midstream from Quantum for consideration of $5.2 billion, equally split between cash and EQT common stock.

12. The agreement includes the acquisition of approximately 55 million shares of EQT common stock valued at $2.6 billion.

13. Quantum would become one of the largest shareholder of EQT, controlling approximately 11% of EQT stock.

14. In a press release dated September 6, 2022, EQT announced that Wil VanLoh, Founder and CEO of Quantum Energy Partners, would join the EQT board of directors following the close of the proposed acquisition.

#### The Mineral Company Joint Venture

15. EQT formed The Mineral Company ("TMC") as a wholly-owned business in April 2020. In October 2020, EQT and a Quantum affiliate entered into an agreement that transformed TMC into a joint venture. Quantum committed funding to TMC. While Quantum and EQT jointly owns TMC, EQT operates TMC and controls TMC's board of managers.

16.     TMC serves as a vehicle for the purchase of mineral rights in the Appalachian Basin, for EQT's natural gas exploration and production activities. EQT identifies the areas where it intends to drill and the timelines for its proposed drilling activity to TMC, and TMC negotiates mineral rights acquisitions.

17.     The joint venture requires that EQT offer to TMC a right of first refusal before EQT purchases any mineral rights within a specified geographic area. Through these interactions, TMC receives competitively sensitive, non-public information about EQT's drilling plans, strategies, and operations. TMC's Board of Managers includes two Quantum employees, one of whom also participates in other Quantum natural gas businesses in the Appalachian Basin.

18.     TMC provides Quantum with periodic reports of its mineral interest acquisitions. These reports include the location of mineral rights acquired by TMC as well as the price paid for those mineral rights.

19.     These reports also include: a list of wells drilled or completed on lands comprising such mineral interests; a map and schedule of all mineral interests then held by TMC and the operators of such interests; and a description of mineral interest acquisition opportunities actively being pursued by TMC and the budgets for such opportunities.

20. Quantum also receives a semi-annual reserve report, quarterly financial statements, and quarterly board materials for TMC. These materials also may provide insight into competitively sensitive, non-public information about EQT's drilling plans, strategies, and operations.

## IV. TRADE AND COMMERCE

21. The relevant line of commerce is the production and sale of natural gas in the Appalachian Basin, including the Commonwealth of Pennsylvania.

22. Persons engaged in this business produce natural gas through wells within a natural gas play.

23. Produced natural gas is transported by gathering systems to consumers within the basin or to interstate pipelines ultimately to consumers outside the basin.

24. Consumers of natural gas cannot switch to alternative fuels absent significant costs.

## V. INFORMATION SHARING

25. Natural gas production and sale is characterized by a high degree of observable behavior and interrelationships between producers. As a result, in this critical sector of our nation's economy, competitors have ample means and opportunity to access and share competitively sensitive information. This creates substantial risks to competition.

26. In recent years, publicly traded natural gas producers have proclaimed an interest in exhibiting "capital discipline," a business strategy that urges caution and frugality in investing in drilling activities. The approach ensures that firms do not "overproduce" natural gas, instead favoring returning profits to the firm and its shareholders in the form of dividends or stock buybacks. The net effect of this strategy, however, reduces output and keeps prices higher than they would be but-for this strategy.

27. The risks to competition posed by information sharing and signaling behavior is exacerbated by a dense and tangled web of co-investments, joint operations, and other methods of collaboration, between and among natural gas producers and investors in the Appalachian Basin and across the country.

28. For instance, producers may have minority or non-working interests in wells operated by competing natural gas producers, entitling them to information about the performance of their competitor's wells. And more broadly, financial institutions may obtain equity positions across multiple natural gas producers, blurring competitive lines and incentivizing collaboration through information sharing.

29. Information sharing can be harmful to competition. It can allow competitors to preempt or appropriate a rival's competitive business strategies for its own benefit. It can soften competition by disincentivizing others from

competing aggressively if those competitive measures will inevitably be copied or preempted by rivals.

30. It can also facilitate coordination between competitors over development and production plans, pricing strategies, or other competitive decisions, leading industry participants to coordinate production, decreasing output and increasing prices.

## VI.   EFFECTS OF THE CONDUCT

31. The effects of the agreements, as described above, constitute an unfair method of competition and unfair or deceptive in violation of Section 3 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, as amended, 73 P.S. § 201-3, through the following:

   a. the Purchase Agreement poses a threat that Mr. VanLoh will join the EQT board while simultaneously sitting on Quantum's Investment Committee, receiving confidential, competitively sensitive information from both firms and having influence over competitive decisions for both firms;

   b. Quantum's acquisition of approximately 55 million shares of EQT voting stock, making it one of EQT's largest shareholders, creates opportunities and a threat that competitors will directly communicate, solicit, or facilitate the exchange of competitively sensitive

information with the purpose, tendency, and capacity to facilitate coordination;

c. the Purchase Agreement facilitates opportunities for EQT and Quantum to exchange non-public information to exercise capital discipline and coordinate public statements relating to industry benefits from reducing output and maintaining maintenance production; and

d. the joint venture "The Mineral Company" had the purpose, tendency, and capacity to facilitate coordination and poses an ongoing and incipient threat that competitors will directly communicate, solicit, or facilitate the exchange of competitively sensitive information.

32. The Purchase Agreement, as described above, constitutes an interlocking directorate in violation of Section 8 of the Clayton Act, as amended, 15 U.S.C. § 19, by the following:

a. the Purchase Agreement poses a threat that Mr. VanLoh will join the EQT board while simultaneously sitting on Quantum's Investment Committee; and

b. the Purchase Agreement poses a threat that a Quantum-controlled representative will join the EQT board while Mr. VanLoh

simultaneously serves as Quantum's CEO and sits on Quantum's Investment Committee.

## VII.   VIOLATIONS

### Count I

1. Plaintiff repeats and realleges every preceding allegation as if fully set forth herein.

2. The Purchase Agreement described above, if consummated, would violate Section 8 of the Clayton Act, as amended, 15 U.S.C. § 19.

### Count II

3. Plaintiff repeats and realleges every preceding allegation as if fully set forth herein.

4. The Pennsylvania Attorney General has reason to believe that EQT and Quantum are using or about to use a method, act or practice in violation of Section 3 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, as amended, 73 P.S. § 201-3, and that bringing this action is in the public interest under Section 4 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, as amended, 73 P.S. § 201-4.

5. The conduct described above resulting from the Purchase Agreement, if consummated, would constitute an unfair method of competition within the meaning of Section 2 (4)(xxi) of the Pennsylvania Unfair Trade Practices and

Consumer Protection Law, as amended, 73 P.S. § 201-2 (4)(xxi) in violation of Section 3 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, as amended, 73 P.S. § 201-3.

## VIII. **REQUESTED RELIEF**

Accordingly, Plaintiff requests this Court:

    A.    Adjudicate that the Purchase Agreement violates Section 8 of the Clayton Act, as amended, 15 U.S.C. § 19;

    B.    Adjudicate that the Purchase Agreement violates Section 3 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, as amended, 73 P.S. § 201-3;

    C.    Preliminarily and permanently enjoin Quantum and EQT from establishing an interlocking directorate under Section 16 of the Clayton Act, as amended, 15 U.S.C. § 26;

    D.    Preliminarily and permanently enjoin Quantum and EQT from establishing an interlocking directorate and otherwise engaging in methods, acts or practices alleged in this complaint and any other methods, acts or practices which violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law under Section 4 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, as amended, 73 P.S. § 201-4;

    E.    Award Plaintiff its reasonable costs and attorneys' fees; and

F.     Award such other relief as the Court may deem just and proper.

          Respectfully submitted,

          COMMONWEALTH OF PENNSYLVANIA
          OFFICE OF ATTORNEY GENERAL

          Michelle A. Henry
          Attorney General

          James A. Donahue, III
          First Deputy Attorney General

          Mark A. Pacella
          Executive Deputy Attorney General
          Public Protection Division

By:    /s/ *Tracy W. Wertz*
       Tracy W. Wertz
       Chief Deputy Attorney General
       PA Bar #69164
       Antitrust Section

       Joseph S. Betsko
       Assistant Chief Deputy Attorney General
       PA Bar #82620

       Norman W. Marden
       Senior Deputy Attorney General
       PA Bar #203423
       Office of Attorney General
       Antitrust Section
       14th Floor, Strawberry Square
       Harrisburg, PA  17120
       (717) 787-4530
       (717) 705-7110 (fax)

       *Attorneys for the Commonwealth of Pennsylvania*